### Bishop and another *against* Warner and another.

Where *A* gave his notes to three persons, for *B's* benefit, one for 1500 dollars, and another for 3500 dollars, and took from *B* his note for 5000 dollars, secured by mortgage; it was held, that there was nothing objectionable in this transaction.

Where a variety of articles are attached, and it requires considerable time to complete the process; if the officer, after he has begun it, continues in it, with no unnecessary delay, until he has secured all the goods, the taking is to be treated as but one act.

But where an officer took and removed sundry finished carriages, to an amount which he deemed sufficient to secure the demand in the writ; and on the day following, having changed his mind in regard to some of the property, he determined not to take away a part of the finished carriages, which he had so attached, but in lieu thereof, to make another attachment of the unfinished work, which he did; and then he removed that unfinished work, with four of the carriages first attached; it was held, 1. that such attachment might properly be considered as consisting of two distinct acts; one, in taking the finished carriages, on the first day; and the other, the unfinished work, on the succeeding day; 2. that, at any rate, it was the clear right of the jury to pass upon the conflicting claims of the parties on this question; and the jury, having found, that the acts were distinct, the court refused to interfere with the verdict on this point.

*A*, in 1841, and again in *December*, 1845, executed mortgages of his real and personal property to *B*, to secure a certain note. Between these dates, there was no change in the possession of the property mortgaged. At the latter date, *A* delivered formal possession to *B*, of all the personal property and of the real estate on which it was; and afterwards, on successive assignments of the mortgage, or of the interest of individuals therein, a like formal deliv-

ery of possession, was made to the assignee; but, in each instance, *A* was immediately afterwards re-established in possession, carrying on his business with the mortgaged property, in the same manner as before; paying his debts to other creditors with that property, and conducting therewith as if he were the absolute owner;—generally professing to act as agent of the mortgagee, or his assignee, but in fact acting without accountability to any one. The property having remained in this situation until *November*, 1846, a creditor of *A* then attached some of the specific articles mortgaged. In an action of trover, brought by an assignee of the mortgagee, claiming to be in possession, against such attaching creditor, it was held, that the change of possession, was merely colourable, and the property remained liable to attachment as the property of *A*.

*Litchfield*,
July, 1849.

Bishop
*v.*
Warner.

THIS was an action of trover for four leather-top carriages.

The defendants pleaded, 1st, the general issue: 2dly, a special plea, alleging, that on the 6th of *November*, 1846, the defendants, at one and the same time, by one and the same act, took from the possession of the plaintiffs, and converted to their own use, four leather-top carriages, which are the same carriages in the plaintiffs' declaration mentioned, and ten running gears, or parts of carriages; that the plaintiffs afterwards, at the county court holden at *Litchfield*, on the third *Tuesday*, of *December*, 1846, impleaded *A. C. Shelton*, one of the present defendants, for the same taking of said running gears or parts of carriages; that such proceedings were thereupon had, that at the *February* term of the superior court in 1848, the plaintiffs, by the consideration and judgment of that court, recovered in said plea against said *Shelton*, the sum of 7 dollars, for the damages which they had sustained, by the taking of said running gears, or parts of carriages, and the sum of 38 dollars, 57 cents, costs of suit; and that afterwards, on the 11th of *April* 1848, and since the last continuance of this suit, said *Shelton*, paid to the plaintiffs said damages and costs, in full satisfaction of said judgment, and of the trespass in the plaintiffs' declaration mentioned.

There were two additional pleas; one alleging, that said *Shelton*, on the 11th of *April*, 1848, paid to the plaintiffs the sum of 45 dollars, 37 cents, in full satisfaction and discharge of the grievances in the declaration mentioned, which they received and accepted of said *Shelton*, in full satisfaction and discharge of said grievances; the other alleging, that such payment was made by, and received of, the defendants.

On all these pleas, issues were joined ; and the cause was tried thereon, at *Litchfield, December* adjourned term, 1848.

The plaintiffs claimed title to the property described in the declaration, as mortgagees in possession. The conversion complained of, was effected, as they claimed, by the attachment of the property, on the 6th of *November*, 1846, by the defendant *Warner*, in a suit in favour of said *Shelton*, against *Zalmon Coley, Lucius Bradley, Joel Blakeslee* and *Samuel P. Whiting*.

In support of the claims of the plaintiffs, they introduced the following documentary evidence.

1. A mortgage deed of land, dated *August* 26, 1841, from *Coley, Bradley & Co.* to *Langdon, Blakeslee & Scovill,* to secure the payment of a note for 5000 dollars.

2. Two mortgage deeds, executed by *Lucius Bradley,* to the same grantees, and of the same date, (with one day's difference between them,) to secure the same note for 5000 dollars.

3. A mortgage deed, executed by *Zalmon Coley,* to the same grantees, of the same date, to secure the same note.

4. A mortgage deed, executed by *Coley, Bradley & Co.,* of all their personal property of every description, to the same grantees, dated *December* 19th, 1845.

5. A release deed, executed by *Langdon* and *Blakeslee,* to *Henry Scovill,* of all their interest in the deed of 1845, dated *January* 26th, 1846.

6. A release deed, executed by *Elizur Wilson* to *Hezekiah Allen,* of all the releasor's interest in the deed of 1845, dated *October* 20th, 1846.

7. Sundry promissory notes, mentioned or referred to, in the opinion of the court in this case.

The plaintiffs also introduced the testimony of the following witnesses, *viz. Henry Scovill, Edward Langdon, Ransom Blakeslee, George A. Smith, George Cook, Henry B. Graves,* and *Charles E. Hayes.*

On the part of the defence, the defendants introduced the following evidence, *viz.*

1. The original attachment, officer's return and judgment against *Coley, Bradley & Co.* The writ bore date *November* 5th, 1846. The return stated the attachment of four top carriages and ten running gears.

2. Proceedings in replevin. Writ dated *November* 7th, 1846, and served the same day. Judgment of the superior court, *February* term, 1848, for 7 dollars, damages, and 38 dollars, 57 cents, costs ; which sums, it was agreed, were paid and satisfied.

The defendants also introduced the testimony of the following persons, *viz.*   *William R. Bishop, David Cook, Samuel P. Whiting, Elisha Johnson, David C. Bevins, Theron Beach, Charles E. Hayes, George A. Smith, Lyman Beach* and *Elijah B. Fenton.*

The testimony on both sides is too voluminous to be detailed here. The material facts sworn to, appear in the opinion of the court,—sufficiently, at least, to form the basis of the questions determined.

The jury gave a verdict for the plaintiffs ; and the defendants moved for a new trial, on the ground that the verdict was against the evidence in the cause.

*T. C. Perkins* and *G. H. Hollister,* in support of the motion, contended, 1. That the mortgage was in law, a fraud upon the rights of creditors, being made solely to secure the mortgagors, and protect their property from attachment. At the date of the note for 5000 dollars, which is the basis of that mortgage, and of all the subsequent ones, both of real and personal property, not one dollar was due to the payees, and it was not certain, that the makers would fail to meet the notes for which the note for 5000 dollars was given. This is clearly proved, by the testimony of *Langdon, Blakeslee* and *Scovill.*

2. That the transaction was a direct evasion of our recording system. So far from stating the true terms of the contract, it proclaimed to the creditors of *Coley, Bradley & Co.,* the existence of a contract totally different. It did not even appear from the record, that the mortgage was given as an indemnity ; but it was declared, in so many words, that there was a liquidated *bona fide* debt, which was expressed in the form of a note for 5000 dollars, and which the mortgage was intended to secure ; so that it must have operated as a direct imposition upon creditors, and all others who were not privy to the arrangement.   *Sanford* v. *Wheeler,* 13 *Conn. R.* 165. 168.  *Pettibone* v. *Griswold,* 4 *Conn. R.* 158.  *North* v.

Belden, 14 Conn. R. 376.   Stoughton v. Pasco, 5 Conn. R. 442.   Shepard v. Shepard & al., 6 Conn. R. 37.

3. That the mortgagees never went into possession. The whole series of mortgages, both of real and personal estate, were given to secure the note for 5000 dollars; and of course, possession was necessary to consummate every one of these transfers.   Wordall v. Smith, 1 Campb. 333.   Hamilton v. Russell, 1 Cranch 310. 317, 18.   Paget v. Perchard & al. 1 Esp. R. 205.   Toby v. Reed, 9 Conn. R. 206.   Swift v. Thompson, Id. 63.   Patten v. Smith, 5 Conn. R. 196.

4. That there was but one distinct trespass; and therefore, the former judgment was a bar to this action.

Seymour and H. B. Graves, contra, after remarking, that a new trial will not be granted, on the ground of the verdict being against the evidence, unless the mistake of the jury is clear and palpable; and referring to Laflin v. Pomeroy, 11 Conn. R. 446.   Bacon v. Parker, 12 Conn. R. 212.   Bulkley v. Waterman, 13 Conn. R. 328.—contended, 1. That the evidence in this case established a clear title in the plaintiffs.   On the 10th of September, 1846, Henry Scovill conveyed to the plaintiffs, his interest in the property in the shop, and received for it from Bishop, one of the plaintiffs, 2960 dollars, and from Bishop and Wilson, a bond of indemnity for being indorsee on Geer's paper, to the amount of 1600 dollars.   On the 2d of October, 1846, Allen came into the place of Wilson.   At that time, there was a formal delivery to Allen of the property; Bishop and Wilson having taken possession on the 10th of September, previous.   These facts certainly gave the plaintiffs a complete title, as mortgagees in possession, against third persons, and against all the world, except the creditors of Coley, Bradley & Co.   This property belonged either to Coley, Bradley & Co., or to the plaintiffs; and as between Coley, Bradley & Co., and the plaintiffs, it clearly belonged to the latter.   The title of the plaintiffs was acknowledged, by Coley, Bradley & Co., by their taking, under the plaintiffs, an agency in disposing of the property, in the name and for the benefit of the plaintiffs.

2. That the title of the plaintiffs would prevail against the creditors of Coly, Bradley & Co.   Here it is to be remarked, in the first place, that the burden of proof, is upon the defend-

ants; for the title being good between the parties, it is good against all the world, unless infected with fraud; and fraud must always be proved, and will not be presumed, without sufficient proof. Secondly, even if there were fraud, in the original mortgages to *Blakeslee*, *Langdon* & *Scovill*, either actual or constructive, there is nothing to impeach the good faith of these plaintiffs. About two months prior to this attachment, they paid 2900 dollars, and assumed the payment of 1600 dollars; in consideration of which, they received an assignment of *Scovill's* interest in the property. There is no evidence to show, that this arrangement was not for a full and valuable consideration, and in fact, made in good faith. Was it constructively fraudulent, for want of delivery of possession? This question was submitted to the jury, and is a question peculiarly within the province of a jury; and they have found the fact, in conformity with the weight of evidence. [The counsel here referred to the testimony of *H. B. Graves*, Esq. and *William R. Bishop.*] The remarks of *Bissell*, J., in the case of *Talcott* v. *Wilcox*, 9 *Conn. R.* 139., are peculiarly applicable to this case. In that case, great stress is laid upon the fact, that *Jared G. Talcott* acted, not in his own right, but as the mere agent of the plaintiff, and in the name and behalf of the plaintiff. In this case, there is no evidence whatever, tending to show, that the agency of *Coley, Bradley & Co.*, was merely colourable.

3. That the recovery by these plaintiffs of 7 dollars, in an action of replevin, for the taking of the unfinished work, is no bar to this action, for taking these finished carriages, of the value of 600 dollars. The rule to prevent a multiplicity of suits, for the taking of several articles of property, at the same time, by the same act, is a mere rule of *policy*, and does not arise from any peculiar tenderness of the law towards a tort-feasor; and there is no reason why, if the takings are, in fact, distinct, the plaintiff may not treat them as distinct takings. The plaintiff is never to be entrapped, by the claim that the taking was the same, where, at the time of the taking, any distinction was made between the taking of one piece of property and that of another. Here, it may be observed, in the first place, that the unfinished work, which was the subject of replevin, and the finished work, which is the subject of this action, were in different

buildings ; and some interval of time certainly took place between the taking of these different parcels of property. Secondly, it is also certain, that the taking of these different parcels, was the subject of distinct discussion ; and different considerations were brought to bear upon them, respectively. Thirdly, the testimony of Mr. *Graves*, corroborated by that of *Hayes, George Cook, Beach, Fenton* and *Smith*, fully establish the position in question.

HINMAN, J.    The motion asks for a new trial, on the ground, that the verdict is against the evidence in the cause. It is claimed to be so, in several particulars.

1. It is insisted, that the witnesses, principally relied on, by the plaintiffs, to make out their case, namely, *Scovill, Langdon* and *Blakeslee*, really prove, that the mortgages, under which the plaintiffs claim title, are void ; as having been given to secure only the conditional liabilities of the mortgagees ; and as they purported only to secure an absolute note for 5000 dollars, they were, within the principle of *Sanford* v. *Wheeler*, 13 *Conn. R.* 165., invalid, on the ground that they were given to secure a claim altogether different, in its nature and character, from the one referred to and described in the deeds.    This question depends upon, whether the consideration of the note for 5000 dollars, was such as the defendants claimed it—security for certain conditional liabilities of the mortgagees—or whether it was, as the plaintiffs claimed, the absolute note of the mortgagees to *Apollos Warner's* estate for 1500 dollars, and a like absolute note to the bank for 3500 dollars.    The jury have found the plaintiffs' claim true ; and we are satisfied with their finding on this point.    The testimony of Mr. *Scovill*, alone, would leave the question in some doubt : perhaps, upon his testimony, the fair inference would be, that the consideration of the note was such as the defendants claim it ; but, while his testimony is not very clear upon the point, that of Mr. *Langdon*, with whom Mr. *Blakeslee* agrees, seems to leave little, if any doubt, upon the question.    The mortgagees were, probably, men of property, and in good credit ; and they loaned to *Coley & Bradley* their notes, to the amount of 5000 dollars, to enable them to raise money, and took, in exchange, their absolute note for 5000 dollars, secured by the mortgages in question.    We see nothing objectionable in this·

*Litchfield,*
July, 1849.

Bishop
*v.*
Warner.

2. It is claimed, that the evidence showed, that the plaintiffs had recovered a former judgment for the trespass complained of in this suit, which had been paid and satisfied; and, therefore, they could not again recover for the same injury.

It appears, that after the defendants had attached the property mentioned in this suit, together with certain unfinished materials for carriages, the plaintiffs instituted two suits against them; one, an action of replevin, for the unfinished work on which the plaintiffs had recovered judgment, and that judgment was satisfied; and the other, the present action of trespass, for the finished carriages mentioned in the declaration. The property had all been taken, by virtue of a single attachment, to secure the damages demanded in that process. The officer returned, that it was all taken at the same time; and, it being all found together, or nearly so, on the same premises, either in separate shops, or in separate rooms of the same shop, but all at the same manufacturing establishment: and there also being the evidence of some of the witnesses, tending strongly to show, that it was all taken at the same time, or within a short time after the service of the attachment was commenced, obviously a strong *prima facie* case of but one taking was made out. Where a variety of articles are attached, as in the case of goods in a store, it will often occupy some considerable time for the officer to take possession of, inventory, and secure them all. The officer, in this case, was employed parts of two days in this business; yet, if he goes about the service, and with no unnecessary delay, continues in it, till he has secured all the goods, it should be treated as but one act; and a party who attempts, in such a case, to split up a single act, into a number of distinct trespasses, is certainly not entitled to have any great favour extended to him. The officer, in such case, generally has no interest in making two or more distinct takings, of what may as well all be done at once; and the presumption, therefore, is very strong, from the facts in the case, in favour of the claim made by the defendants, on this point. Still, this was a question for the jury alone; and from the testimony of Mr. *Graves*, we think they were justified, in finding that there were, in fact, two distinct takings in this case:—

that the officer, on the day when the service was commenced, took and removed finished carriages, to an amount which he deemed sufficient to secure the demand in the writ; and that, on the day following, having changed his mind in regard to a part of the property, he determined not to take away a part of the finished carriages, which he had first attached, but in lieu thereof, to make another attachment of the unfinished work, which he did; and then, he removed that unfinished work, with the four carriages, for which damages are claimed, in this action. These facts, we think, are sufficient to justify the plaintiffs, in treating the attachment as two distinct acts; one, in taking the finished carriages, on the first day; and the other, the unfinished work, on the second day. It was the clear right of the jury, to pass upon the conflicting claims of the parties, on this question. It was a point, on which different minds might reasonably come to different results; and on such a point, especially where the verdict is in conformity to the justice of the case, so far as it rests on this question, we should not feel justified, in interfering with it.

We do not, therefore, advise a new trial, on either of these grounds.

3 The carriages in question, were attached, by the defendants, by virtue of legal process against *Coley, Bradley & Co.*, who had formerly been the undisputed owners of them, and are so still, unless the title had become vested in the plaintiffs, by virtue of certain mortgages to *Henry Scovill, Edward Langdon* and *Ransom Blakeslee*, and the assignment of those mortgages to the plaintiffs. There was no question but that the plaintiffs made out a good paper title, by virtue of the assignment to them of these mortgages. But it was claimed, that neither the original mortgagees, nor the plaintiffs, as their assignees, had ever had possession of the property; but, that it had been suffered to remain in the possession of the mortgagors; and on that ground, that the mortgages were constructively fraudulent and void, as against the defendants' attachment. And the question now is, whether there was any evidence, which justified the jury in finding, that the possession had been changed from *Coley, Bradley & Co.,* to the original mortgagees, or to the plaintiffs.

The first mortgage was made in 1841; and from that

time up to 1845, the date of the second mortgage, there is
no claim, or pretence, of any change in the possession.
What, then, was done in 1845? And, what was the condition
of the property, from that time up to the time of the attach-
ment? Formal possession was indeed delivered to the
mortgagees, in *December*, 1845; and this seems to have
been thought all that was necessary. The parties went, in a
formal manner, through all the different rooms and shops of
the establishment, and delivered possession to the mort-
gagees, of all the personal property, and of the real estate
on which it was; and a like formal possession was delivered
to *Scovill*, after he took an assignment from his co-mort-
gagees; and so, again, on his transfer to *Bishop* and *Wilson*;
and, also, on the transfer from *Wilson* to the plaintiff, *Allen*,
there was, on each of these occasions, a like delivery of pos-
session. The parties seem to have acted upon the idea, that
the mere delivery of the possession, was enough to satisfy
the rule of law on this subject; and that immediately there-
after, the possession might well enough go back again into
the hands of *Coley, Bradley & Co.*; and that if they pro-
fessed to be in possession, as the agents of the mortgagees,
the property was secure from attachment by their creditors.
Hence, we find *Coley, Bradley & Co.*, immediately after each
of these transfers of possession to other persons, re-estab-
lished again in possession of all their property, carrying on
their business, in the same manner as when they were the
acknowledged owners of the establishment;—generally, we
are aware, professing to act as agents for those in whom it
was claimed, for the time being, was the paper title to the
property; but yet, in fact, acting without accountability to
any one; paying their debts to other creditors, with the
mortgaged property, as if they were the undisputed owners.
Now, such a possession as this, is no better than none at all.
There was just about enough done to satisfy an intelligent
mind, that the possession of the mortgagees, and those claim-
ing under them, so far as they may be said to have had any
possession at all, was merely colourable, and not real.
Indeed, Mr. *Scovill*, one of the original mortgagees, while he
speaks in one part of his testimony, of having taken posses-
sion,—alluding, undoubtedly, to the formal possession which
was taken by him—says, in another part, that the mort-

gagors, after the mortgage, " remained in possession as before :"—and again, he says, in another part, " *Coley & Bradley* did the business in his name." So, again, Mr. *Blakeslee,* another of the original mortgagees, says, " *Coley, Bradley & Co.* managed the business, as if there had been no mortgage, until the second mortgage was made ; and then *Blakeslee,* [who was then one of the firm of *Coley, Bradley & Co.,*] was authorized to send orders, as the agent of the mortgagees ; that the company made contracts to carry on the shop ; and when the defendants attached, the business went on, as it had done previously."

It is worthy of remark, that the mortgages, if intended for anything more than to keep creditors from attaching the property, were mortgages of specific articles, to secure a note for 5000 dollars ; and yet, for about a year after the possession was first formally delivered, up to the time of the attachment, the mortgagors were carrying on an extensive manufacturing business, with the mortgaged property ;—supplying their customers from day to day ; selling the carriages, as they were finished, and they were able to find purchasers ; and yet no account of the avails was, at any time, taken. Can any thing, short of direct and positive evidence of the fact, more clearly or satisfactorily show, that the possession, from time to time, delivered to the different assignees of the mortgages, was merely formal and pretended ; that it was done, only, because its tendency was, as stated by Mr. *Langdon,* to keep creditors off? Such a possession, surely, is no better than none : if any thing, it is rather worse than none. An entire neglect to take possession, renders a sale, or mortgage, constructively fraudulent ; and, in some cases, undoubtedly, is conclusive evidence of a fraudulent trust, when there is none such in fact. But where the possession is only colourably changed, the parties themselves knowing and admitting that its tendency is to keep creditors off, it can hardly be otherwise, than that such was its principal object ; and therefore, fraudulent in fact.

On the ground that there was no real change in the possession of this property ; and that there was no evidence in the case, that authorized the jury to find any such change of possession ; we are satisfied, that it remained liable to attachment, as the property of *Coley, Bradley & Co. ;* and conse-

quently, the defendants had right to attach it ; and the jury having misapplied and mistook the evidence, on this point, a new trial is advised.

In this opinion the other Judges concurred, except WAITE, J., who was not present.

New trial to be granted.